UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------x

UNITED STATES OF AMERICA,                                    Case No: 18-CR-485 (LAP)

               -against-

MOSHE BENENFELD,

                       Defendant.

------------------------------------------------------------------------x

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT MOSHE BENENFELD'S
MOTION FOR COMPASSIONATE RELEASE UNDER 18 U.S.C. § 3582(c)(1)(A)**

**TWERSKY PLLC**
747 Third Avenue, 32nd Floor
New York, New York  10017
(212) 425-0149

*Attorneys for Defendant Moshe Benenfeld*

Of Counsel:
     Aaron Twersky, Esq.
     Jason Lowe, Esq.
     Ilana Neufeld, Esq.

## <u>TABLE OF CONTENTS</u>

**PRELIMINARY STATEMENT** ............................................................... 2

**BACKGROUND AND FACTS** ................................................................ 3

   **A.** Procedural History ..................................................................... 3
   **B.** Moshe Benenfeld's Severe Medical Issues................................. 5
   **C.** The Heightened Risk Of COVID-19 Inside Prisons And Jails........... 6

**ARGUMENT** ............................................................................................ 8

**POINT I**

**THIS COURT HAS AUTHORITY TO RESENTENCE
BENENFELD UNDER 18 U.S.C. § 3582(c)(1)(A)(i) FOR
THE "EXTRAORDINARY AND COMPELLING REASONS"
CREATED BY THE COVID-19 PANDEMIC AND PRISON CONDITIONS
WHICH PREVENT SELF-CARE FOR A HIGH RISK PATIENT** ...................... 8

**POINT II**

**THE COURT CAN WAIVE THE 30-DAY REQUIREMENT FOR
EXHAUSTION OF ADMINISTRATIVE REMEDIES UNDER 18 U.S.C. §
3582 (c)(1)(A) BECAUSE OF THE URGENT RISK OF FATAL INFECTION** .... 10

   **A.** Requiring Administrative Exhaustion Would Be Futile In This Case................. 12
   **B.** Benenfeld Will Suffer Irreparable Harm
      If Forced To Exhaust Administrative Remedies................................. 14
   **C.** Benenfeld Should Be Deemed To Have Exhausted His Remedies ................... 16
   **D.** The Factual Record Is Properly Developed
      Which Allows The Court To Rule On This Application ..................................... 18

**POINT III**

**THE COVID-19 OUTBREAK PRESENTS A COMPELLING
AND EXTRAORDINARY CIRCUMSTANCE THAT
WARRANTS COMPASSIONATE RELEASE FOR
BENENFELD, WHO IS A HIGH-RISK FATALITY PATIENT** ............................ 18

   **A.** COVID-19 Response And Cases In Massachusetts............................................ 19
   **B.** Guidance From The Centers For Diseases Control And Prevention
      Requires Granting Moshe Benenfeld's Request For Compassionate Release..... 20
   **C.** The Attorney General Memorandum And Case Law Require
      Granting Moshe Benenfeld's Request For Compassionate Release.................... 21

**POINT IV**

**THE CONDITIONS OF BOP INCARCERATION FOSTER
THE SPREAD OF COVID-19, AND BENENFELD'S AGE
AND PREEXISTING MEDICAL CONDITIONS RENDER HIM
PARTICULARLY SUSCEPTIBLE TO AN UNREASONABLE
RISK OF DEATH AND AN INABILITY TO TAKE PREVENTATIVE
MEASURES OR SELF-CARE RECOMMENDED BY THE CDC** ......................... 25

    **A.** The Conditions At Devens Prevent Benenfeld From Protecting Himself ........... 26

**POINT V**

**THE RELEVANT § 3553(a) FACTORS, INCLUDING
BENENFELD'S RELEASE PLAN, FAVOR RESENTENCING** ............................ 28

**CONCLUSION** ............................................................................................ 34

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------------------x

UNITED STATES OF AMERICA,                    Case No: 18-CR-485 (LAP)

               -against-

MOSHE BENENFELD,

                           Defendant.
--------------------------------------------------------------------------x

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT MOSHE BENENFELD'S**
**MOTION FOR COMPASSIONATE RELEASE UNDER 18 U.S.C. § 3582(c)(1)(A)**

    Defendant Moshe Benenfeld ("Benenfeld"), by and through his counsel of record, Twersky PLLC, submits this memorandum of law in support of his Motion for Compassionate Release (the "Motion"). Benenfeld respectfully requests that the Court grant the Motion under 18 U.S.C. § 3582(c)(1)(A) and order the remainder of his sentence to be served under home confinement and incarceration. The motion should be granted due to the "extraordinary and compelling reasons" confronting the federal prison system by the pandemic of COVID-19 and the fact that Benenfeld, at age 51, suffers from a host of very serious medical issues and is not a danger to the community. Further, given the cataclysmic events of the current pandemic, this Motion should also be granted because respect for the law, general deterrence and other notable 18 U.S.C. § 3553(a) factors would not be undermined by converting the remainder of Benenfeld's sentence to home incarceration. We respectfully ask the Court to consider this motion on an expedited basis as each day in custody brings renewed and unthinkable risk to Moshe Benenfeld's life.

## PRELIMINARY STATEMENT

As the Court is well aware, we are in the middle of an unprecedented pandemic, as COVID-19 sweeps across our nation, killing people in its wake.  As of April 3, 2020, "[t]he coronavirus pandemic has sickened more than one million people, according to official counts . . . [and] at least 54,000 people have died" worldwide.[1]  By the time the Court reviews this application that number will have significantly increased.  The exponential rate of COVID-19 infection is unparalleled in our lifetime.

There are certain groups of people who are at a higher risk of getting seriously ill and potentially dying if they contract COVID-19.  "Data from China have indicated that older adults, ***particularly those with serious underlying health conditions***, are at higher risk for severe COVID-19 associated illness and death than are younger persons."[2]  Further, the CDC has reported that nearly 40% of patients hospitalized from coronavirus were 20 to 54 years old.[3]  Additionally, those in prison are even more susceptible to COVID-19 than the average person.[4]  ***Therefore, Moshe Benenfeld, a 51 year old man who suffers from a host of medical conditions and is currently incarcerated, is extremely vulnerable to the COVID-19 pandemic and this Motion for Compassionate Release must be granted***.

---

[1]      *See Coronavirus Map: Tracking the Spread of the Outbreak*, The New York Times, available at https://www.nytimes.com/interactive/2020/world/coronavirus-maps.html (updated regularly).

[2]      *See Severe Outcomes Among Patients with Coronavirus Disease 2019 (COVID-19) – United States, February 12-March 16, 2020*, Centers for Disease Control and Prevention Report, available at https://www.cdc.gov/mmwr/volumes/69/wr/mm6912e2.htm (emphasis added).

[3]      *See Younger Adults Make Up Big Portion of Coronavirus Hospitalizations in U.S.*, The New York Times (Mar. 20, 2020), available at https://www.nytimes.com/2020/03/18/health/coronavirus-young-people.html.

[4]      *See Prisons and Jails are Vulnerable to COVID-19 Outbreaks*, The Verge (Mar. 7, 2020), available at https://www.theverge.com/2020/3/7/21167807/coronavirus-prison-jail-health-outbreak-covid-19-flu-soap; *see also An Epicenter of the Pandemic Will Be Jails and Prisons, If Inaction Continues*, The New York Times (March 16, 2020), available at https://www.nytimes.com/2020/03/16/opinion/coronavirus-in-jails.html.

## BACKGROUND AND FACTS

### A. Procedural History

Benenfeld plead guilty and was convicted of one count of Bank Fraud, in violation of 18 U.S.C. § 1344.  This offense arose out of Benenfeld's conduct of engaging in unauthorized transactions with customer bank accounts, while employed by a financial institution.  Following his guilty plea, on November 22, 2019, the Court sentenced Benenfeld to 63 months of imprisonment, followed by 5 years of supervised release.  Benenfeld has been in custody since January 30, 2020, when he self-surrendered to the Federal Bureau of Prisons ("BOP") facility at FMC Devens in Devens, Massachusetts ("Devens").  His expected date of release, as calculated by the BOP, is July 19, 2024.

On March 27, 2020, Benenfeld filed an administrative relief application with the warden of Devens, likewise seeking compassionate release on the same grounds as submitted herein.  On April 2, 2020, Benenfeld's counsel likewise emailed and faxed a letter to the warden, Warden S. Spaulding, again reiterating Benenfeld's potentially life-saving request.  *See* Exhibit A to the Declaration of Aaron Twersky ("Twersky Decl."), Letter to Warden, dated April 2, 2020 ("Letter").  Warden Spaulding's secretary, Ms. Gomez confirmed receipt of the Letter over the phone on April 2, 2020.  *See* Twersky Decl., ¶ 4.  Ms. Gomez relayed to counsel that a response would likely take some time, as there have been many requests like Benenfeld's received.  *See* Twersky Decl., ¶ 5.  Additionally, Ms. Gomez surmised that the response will likely be a denial, based upon Benenfeld's age and nothing else.  *See* Twersky Decl., ¶ 6.  On April 3, 2020, Warden Spaulding also confirmed the Letter's receipt and Benenfeld's application via email. *See* Exhibit B to the Twersky Decl., Confirmation Email, dated April 3, 2020.  The emails further state that there was no time frame for how long the review process may take or when a

3

decision may be made.  *See* Twersky Decl., ¶ 8.

On April 2, 2020, Benenfeld's counsel also conferred with the Government regarding this request and was advised "[w]e have to track down a few things on our end.  I can't guarantee when we will get you a response on our position."  *See* Exhibit C to the Twersky Decl., Emails with AUSA, dated April 2, 2020.

Because of the urgency of the spread of COVID-19 across the United States and the state of Massachusetts (which as of April 2, 2020 has nearly 9000 COVID-19 cases[5]), as well as its rapid entrance and continued spread into BOP facilities (as of April 2, 2020, there are 75 federal inmates and 39 staff within BOP who have tested positive)[6], we respectfully ask the Court to waive the exhaustion requirement.  As explained below, there is a plethora of case law which permits the Court to do so, in extenuating circumstances such as these.  ***Waiting for a response could cost Moshe Benenfeld his life***.

In sentencing Moshe Benenfeld to 63 months in prison, this Court did not intend to impose a death sentence on him.  Indeed, the term of imprisonment imposed was at the lowest end of the United States Sentencing Guidelines ("USSG" or the "Guidelines") range of 63 to 78 months.[7]  As it stands now, Benenfeld would be released from prison at the age of 55.  However, because of his extreme medical diagnosis and conditions, coupled with the unthinkable spread of a global pandemic that is killing people with pre-existing medical conditions at alarming rates, ***Moshe Benenfeld faces a serious risk of dying in prison if infected with COVID-19***.[8]

---

[5]    *See COVID-19 cases in Massachusetts*, available at https://www.mass.gov/info-details/covid-19-cases-quarantine-and-monitoring (updated daily).
[6]    *See COVID-19 Tested Positive Cases*, available at https://www.bop.gov/coronavirus/ (updated daily).
[7]    It should be noted that in the Presentencing Investigation Report (the "PSR"), the custodial sentence recommended by USPO Michelle Millan was 36 months, followed by 5 years of supervised release.  *See* Exhibit C to the Declaration of Aaron Twersky, PSR, Doc. 26, p. 28.
[8]    *See Severe Outcomes Among Patients with Coronavirus Disease 2019 (COVID-19) – United States, February 12-March 16, 2020*, CDC Report, available at https://www.cdc.gov/mmwr/volumes/69/wr/mm6912e2.htm

**B.  Moshe Benenfeld's Severe Medical Issues**

Though Benenfeld is "only" 51, his health is extremely fragile and he is severely

immuno-compromised; therefore he is at a higher risk of becoming critically ill if he were to

contract COVID-19.  As relayed to the Court in the PSR, Moshe Benenfeld is "in poor health."

*See* Exhibit D to the Twersky Decl., PSR, Doc. 26, ¶ 85.  He has been hospitalized tens of times

in the last 5 years and prior to his incarceration, was under the care of various doctors affiliated

with Cornell Hospital, Mount Sinai Hospital and Memorial Sloan Kettering, in specialties such

as general/MD internist, urologist, neurologist, infectious diseases, urologic surgeon, and pain

management.  *See* Exhibit D, PSR, Doc. 26, ¶¶ 85-86.

Benenfeld suffers from a severe bladder condition and bladder cancer, which necessitated

surgery – a radical cystectomy – to remove his bladder and to create an ileal conduit to drain his

urine in February, 2019.  *See* Exhibit D, PSR, Doc. 26, ¶¶ 86, 89; *see also* Exhibit E to the

Twersky Decl., Report of Dr. Matthew E. Fink, dated September 13, 2019, Doc. 29-1.  He has

also been diagnosed with small fiber nerve neuropathy (SFN), a nerve condition that attacks the

hands and legs and multisystem atrophy, for which there is no cure.  *See* Exhibit D, PSR, ¶ 87,

90; *see also* Exhibit E, Report of Dr. Matthew E. Fink, dated September 13, 2019, Doc. 29-1.

Benenfeld has been wheel-chair bound since December 2017 and also experiences paresthesia in

his right hand, tremors in his left hand and in both legs.  *See* Exhibit D, PSR, ¶ 90; *see also*

Exhibit E, Report of Dr. Matthew E. Fink, dated September 13, 2019, Doc. 29-1.  Additionally,

since September, 2019, Benenfeld has been treated for "recurrent multidrug resistant bacteria

that has required multiple admissions to the hospital for intravenous antibiotics to effectively

treat these infections."  *See* Exhibit E to the Twersky Decl., Letter from Dr. Paul T. Smith, dated

---

("Data from China have indicated that older adults, *particularly those with serious underlying health conditions*, are at higher risk for severe COVID-19–associated illness and death than are younger persons") (emphasis added).

April 1, 2020.

Prior to surrendering to Devens, Benenfeld required the full-time assistance of a home health aide, to aide in his most basic and hygienic needs and is prescribed over fifteen medications which he takes daily for his numerous physical ailments.  *See* Exhibit D, PSR, ¶¶ 86, 88, 91.  ***Given his age and his serious medical conditions, we are extremely concerned that when (and not if) the COVID-19 virus spreads through the facility at Devens, it will be a death sentence for Moshe Benenfeld***.[9]

**C.  The Heightened Risk Of COVID-19 Inside Prisons And Jails**

The unparalleled health crisis our country is currently facing and its deadly expected arrival in the nation's prisons present "extraordinary and compelling reasons" to grant Moshe Benenfeld's Motion.  One of the most dangerous places to be during this COVID-19 outbreak is a prison or jail, as "[p]risons and jails are amplifiers of infectious diseases such as COVID-19, because the conditions that can keep diseases from spreading - such as social distancing - are nearly impossible to achieve in correctional facilities."[10]  "We know the coronavirus spreads quickly in closed spaces, like cruise ships, nursing homes — and jails and prisons . . Many people who are incarcerated also have chronic conditions . . . which makes them vulnerable to severe forms of COVID-19."[11]  "'Prisons are almost perfectly designed to promote the transmission of communicable disease,' says Homer Venters, the former chief medical officer at New York City's Rikers Island.  Forget about social distancing: Prisoners eat together, use the same showers, work or watch television side by side, and often sleep in the same dorm room

---

[9]    *See id*.
[10]    *See Responses to the COVID-19 pandemic*, Prison Policy Initiative, (March 31, 2020), available at https://www.prisonpolicy.org/virus/virusresponse.html.
[11]    *See Prisons and Jails are Vulnerable to COVID-19 Outbreaks*, The Verge (Mar. 7, 2020), available at https://bit.ly/2TNcNZY.  https://www.theverge.com/2020/3/7/21167807/coronavirus-prison-jail-health-outbreak-covid-19-flu-soap.

with dozens of other inmates."[12]   The New York Times also recently explained why jails and prisons are one of the most unsafe places to be during the current pandemic, even more hazardous than a cruise ship in the current pandemic.[13]

Further, "[p]eople in jails and prisons also may not be able to regularly wash their hands, which may promote the spread of disease.  Hand sanitizer, which contains alcohol, is usually considered contraband."[14]   Benenfeld has relayed to counsel that though there is hand sanitizer available to inmates at Devens, he does not have his own.  Instead, there is one dispenser in each hallway.  Many times the dispensers are empty, making them useless to help prevent germs and the spread of COVID-19 and infection.  Soap and other personal hygiene products can only be purchased from the prison's commissary.  Besides for the obvious health risks awaiting Benenfeld if he were to contract COVID-19 in prison, the Section 3553(a) factors also weigh in favor of granting this Motion and ordering Benenfeld to finish his sentence under strict home incarceration.

In the unprecedented time that we are living through right now, the humane and compassionate thing to do is to convert Moshe Benenfeld's sentence to home confinement for the remainder of its term.  At his current age and with his medical conditions, when COVID-19 infects Devens, he will not have much of a chance to survive.  As Benenfeld's infectious disease specialist, Dr. Paul T. Smith writes, "[d]ue to his underlying medical and neurologic conditions, ***I would place him at a high risk for complications, including death, if he were to develop***

---

[12]       *See* Barbara Bradley Hagerty, *Innocent Prisoners Are Going to Die of the Coronavirus*, The Atlantic (March 31, 2020), available at https://www.theatlantic.com/ideas/archive/2020/03/americas-innocent-prisoners-are-going-die-there/609133/.
[13]       *See An Epicenter of the Pandemic Will Be Jails and Prisons, If Inaction Continues*, The New York Times (March 16, 2020), available at https://www.nytimes.com/2020/03/16/opinion/coronavirus-in-jails.html
[14]       *See Prisons and Jails are Vulnerable to COVID-19 Outbreaks*, The Verge (Mar. 7, 2020), available at https://bit.ly/2TNcNZY.  https://www.theverge.com/2020/3/7/21167807/coronavirus-prison-jail-health-outbreak-covid-19-flu-soap

*covid-19 infection*."  *See* Exhibit D, Letter from Dr. Paul T. Smith, dated April 1, 2020.

## ARGUMENT

## POINT I

### THIS COURT HAS AUTHORITY TO RESENTENCE BENENFELD UNDER 18 U.S.C. § 3582(c)(1)(A)(i) FOR THE "EXTRAORDINARY AND COMPELLING REASONS" CREATED BY THE COVID-19 PANDEMIC AND PRISON CONDITIONS WHICH PREVENT SELF-CARE FOR A HIGH-RISK PATIENT

Pursuant to 18 USC § 3582(c)(1)(A)(i), a Court, "upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment . . . after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that extraordinary and compelling reasons warrant such a reduction."  *See* 18 USC § 3582(c)(1)(A)(i).[15]  Under 18 USC § 3582(c), Courts are authorized to consider a defendant's motion, even if the BOP opposes it, and order resentencing or modification if it finds that "extraordinary and compelling reasons" warrant a reduction and such a reduction is consistent with the Section 3553(a) factors.  *Id.*

The first modern form of the compassionate release statute, codified at 18 U.S.C. § 3582, was enacted as part of the Comprehensive Crime Control Act of 1984.  However, Congress never defined what constitutes an "extraordinary and compelling reason" for resentencing under Section 3582(c), but legislative history gives an indication of how Congress thought the statute should be employed by the federal courts.  The Senate Committee stressed how some individual

---

[15]   Prior to the enactment of the First Step Act in 2018, defendants could not make a motion for compassionate release under 18 U.S.C. § 3582(c)(1)(A)(i) for "extraordinary and compelling reasons," rather courts had to await a motion from the Director of the BOP to resentence prisoners under the statute.  However, after passage of the First Step Action, defendants can now make the motion directly.

cases may warrant a second look at resentencing and stated:

> The Committee believes that there may be unusual cases in which an eventual reduction in the length of a term of imprisonment *is justified by changed circumstances*. These would include cases of severe illness, *cases in which other extraordinary and compelling circumstances justify a reduction* of an unusually long sentence, and some cases in which the sentencing guidelines for the offense of which the defendant was convicted have been later amended to provide a shorter term of imprisonment.

*See* S. Rep. No. 98-225, at 55-56 (1983) (emphasis added).

Congress intended that the circumstances listed in Section 3582(c) would act as "safety valves for modification of sentences," *id*. at 121, enabling judges to provide second looks for possible sentence reductions when justified by various factors that previously could have been addressed through the abolished parole system. Noting that this approach would keep "the sentencing power in the judiciary where it belongs," rather than with a federal parole board, the statute permitted "later review of sentences in particularly *compelling situations*." *Id*. (emphasis added).

Congress delegated the responsibility for outlining what qualifies as "extraordinary and compelling reasons" to the United States Sentencing Commission (the "Commission"). *See* 28 U.S.C. § 994(t). In 2007, after considerable time, the Commission acted with the very general guidance that "extraordinary and compelling reasons" may include medical conditions, age, family circumstances, and "other reasons." *See* USSG § 1B1.13, app. n.1(A). The Commission amended its policy statement on "compassionate release" in November 2016. *See* USSG § 1B1.13 Amend. 11/1/2016. Notably, in the new policy statement, the Commission concluded that reasons beyond medical illness, age and family circumstances could qualify as "extraordinary and compelling reasons" for resentencing. *See* USSG § 1B1.13, n.1 (including a category for "Other Reasons," when there is "an extraordinary and compelling reason other than,

or in combination with the reasons described in subdivisions (A) through (C)").

For the many reasons mentioned above and which will be outlined below, the 2020 COVID-19 pandemic unquestionably qualifies as an extraordinary and compelling reason under the statute and Sentencing Guidelines, which requires the immediate modification of Moshe Benenfeld's sentence, from a term of imprisonment to a term of home incarceration and confinement.  Though 30 days have not yet elapsed since the warden's receipt of Benenfeld's request for compassionate release due to the threat of COVID-19 infection, this Court can construe the exhaustion requirement as futile and waive it given the urgency of this national emergency and rapid spread of the pandemic.

### POINT II

### THE COURT CAN WAIVE THE 30-DAY REQUIREMENT<br>FOR EXHAUSTION OF ADMINISTRATIVE REMEDIES UNDER<br>18 U.S.C. § 3582(c)(1)(A) BECAUSE OF THE URGENT RISK OF FATAL INFECTION

Moshe Benenfeld filed his petition and request for compassionate release with the warden of Devens, Warden S. Spaulding, on March 27, 2020.  Similarly, on April 2, 2020, counsel for Benenfeld made the same request to Warden Spaulding, and reached out to the Government to confirm its stance on this request, but has not received a firm response from either yet.  *See* Exhibit A, Letter to Warden, dated April 2, 2020; *see also* Exhibit C, Emails with AUSA, dated April 2, 2020.

18 USC § 3582 contains a so-called "exhaustion of remedies" provision, and a defendant ordinarily cannot make a motion for sentence modification unless he has "exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier."  *See* 18 U.S.C. § 3582(c)(1)(A).  However, as

demonstrated below, there are circumstances in which a Court may waive the "exhaustion" requirement. It is clear that in this case the Court can and should find that Moshe Benenfeld has exhausted his remedies or, in the alternative, that the exhaustion of remedies is not required in the current dire context.

Second Circuit precedent supports waiver of the administrative exhaustion requirements under three circumstances. "First, exhaustion may be unnecessary where it would be futile, either because agency decision makers are biased or because the agency has already determined the issue. Second, exhaustion may be unnecessary where the administrative process would be incapable of granting adequate relief. Third, exhaustion may be unnecessary where pursuing agency review would subject plaintiffs to undue prejudice." *United States v. Wilson Perez*, No. 17-CR-513-3 (AT), 2020 WL 1546422, at \*2 (S.D.N.Y. Apr. 1, 2020) (internal citations and quotations omitted); *quoting Washington v. Barr*, 925 F.3d 109, 119 (2d Cir. 2019).

Courts in New York have also "excuse[d] exhaustion if . . . the appeals process is shown to be inadequate to prevent irreparable harm to the defendant" which may come from a delay incident to pursuing administrative remedies. *United States v. Basciano*, 369 F. Supp. 2d 344, 348 (E.D.N.Y. 2005) (addressing Section 2241 habeas claim regarding circumstances of confinement despite defendant's failure to exhaust administrative remedies); *accord United States v. Khan*, 540 F. Supp. 2d 344, 350 (E.D.N.Y. 2007) (under PLRA, "[a] court may, however, excuse the exhaustion requirement if a petitioner demonstrates that pursuing appeals through the administrative process would be futile or that the appeals process is inadequate to prevent irreparable harm to the petitioner"); These exceptions to the exhaustion requirement apply in this case and the Court should excuse the exhaustion requirement if it finds it has not been met. In fact, requiring "administrative exhaustion would defeat, not further, the policies

11

underlying § 3582(c)" in this case.  *See United States v. Wilson Perez*, No. 17 CR. 513-3 (AT),

2020 WL 1546422, *supra*, at *3.

A. <u>**Requiring Administrative Exhaustion Would Be Futile In This Case**</u>

As is indicated above, one circumstance in which exhaustion is frequently waived by

Courts is in the event of futility.  *See United States v. Wilson Perez*, No. 17-CR-513-3 (AT),

2020 WL 1546422, *supra*, at *3; *see also USA v. Colvin*, No. 3:19CR179 (JBA), 2020 WL

1613943, at *4 (D. Conn. Apr. 2, 2020)(adopting the reasoning in *Perez*); *Charboneau v.*

*Menifee*, No. 05-CIV-1900 (MBM), 2005 WL 2385862, at *2 n.3 (S.D.N.Y. Sept. 28, 2005) (in

addressing petition for determining eligibility for placement in a halfway house, the court

excused the defendant's failure to exhaust administrative remedies "on the grounds of futility,

and the likelihood of irreparable injury before further appeals could be exhausted"); *accord*

*Drew v. Menifee*, No. 04 CIV. 9944HBP, 2005 WL 525449, at *3 n.1 (S.D.N.Y. Mar. 4, 2005)

(granting, in part, motion "to release petitioner to community confinement in a halfway house

when petitioner has six months remaining on his sentence after deduction of good time credits,"

explaining that any failure to exhaust administrative remedies "should be excused on the ground

of futility"); *accord* Terry v. Menifee, No. 04 CIV. 4505 (MBM), 2004 WL 2434978, at *2

(S.D.N.Y. Nov. 1, 2004) (excusing failure to exhaust administrative remedies "on the grounds of

futility and irreparable injury" in 2241 habeas corpus petition).

Futility is found where "legitimate circumstances beyond the prisoner's control preclude

him from fully pursuing his administrative remedies." *Carmona* v. *US. Bur. Of Prisons*, 243 F.

3d 629, 634 (2d Cir. 2001) (federal prisoners must exhaust their administrative remedies except

when it appears exhaustion would be futile).  Further, district courts have "excused exhaustion if

it appears that an administrative appeal would be futile, or because the appeals process is shown

to be inadequate to prevent irreparable harm to the defendant." *United States* v. *Basciano*, *supra*, 369 F. Supp. 2d at 348.

Specifically, "undue delay, *if it in fact results in catastrophic health consequences*, could make exhaustion futile." *United States v. Wilson Perez*, No. 17-CR-513-3 (AT), 2020 WL 1546422, *supra*, at *3 (emphasis added); *quoting Washington v. Barr*, *supra*, 925 F.3d at 119; *see also Bowen v. City of New York*, 476 U.S. 467, 483 (1986) (holding that irreparable injury justifying the waiver of exhaustion requirements exists where "the ordeal of having to go through the administrative process may trigger a severe medical setback")(internal quotation marks, citation and alterations omitted); *see also Abbey v. Sullivan*, 978 F.2d 37, 46 (2d Cir. 1992) ("if the delay attending exhaustion would subject claimants to deteriorating health . . . then waiver may be appropriate"); *see also New York v. Sullivan*, 906 F.2d 910, 918 (2d Cir. 1990) (holding that waiver was appropriate where "enforcement of the exhaustion requirement would cause the claimants irreparable injury" by risking "deteriorating health, and possibly even . . . death").

In this case, just like in *United States v. Wilson Perez*, **Moshe Benenfeld risks extreme health consequences and even death if there is a delay in hearing his application for compassionate release**.  In fact, the health consequences seem even more extreme here than in *Perez*, a case decided this week, in this district.  The medical issues in *Perez* were relating to a reconstructive surgery to the inmate's face after an attack, which is not specifically noted as a COVID-19 risk factor, compared to the immuno-compromised condition of Moshe Benenfeld. Benenfeld's listed conditions are specifically indicated as giving him an increased risk of death due to COVID-19 if he were to contract the deadly virus.  *See United States v. Wilson Perez*, No. 17-CR-513-3 (AT), 2020 WL 1546422, *supra*.

Though it is incontrovertible that the health consequences to Benenfeld make any

13

administrative review futile, there is yet another reason administrative review is futile – the BOP has not released specific written guidelines for reviewing compassionate release requests due to COVID-19 pandemic and its health consequences to inmates in its custody, specifically those more vulnerable to COVID-19.  In addition, although the BOP issued guidance in February on its plan to mitigate the COVID-19 outbreak, the BOP has failed to update that guidance, despite new regulations issued to the general public nearly daily, from Federal, State and local governments throughout the country.  The BOP's failure to adequately address the compassionate release requests it has been receiving relating to COVID-19, and its failure to update mitigation plans for the COVID-19 outbreak, further shows the futility in waiting for the BOP to act with regards to Benenfeld's request.

### B.  Benenfeld Will Suffer Irreparable Harm If Forced To Exhaust Administrative Remedies

Requiring Moshe Benenfeld to wait 30 days to exhaust his administrative remedies before bringing this application would certainly result in irreparable harm to him, namely, possible death.  Benenfeld seeks this emergency relief to avoid contracting COVID-19 at Devens where he has a high risk of infection and serious medical complications if he is infected.  "Social distancing" is impossible in the crowded facility, and soap, hand sanitizer and disinfectant products are scarce.  Waiting for Benenfeld to exhaust his administrative remedies would only compound his risk of exposure to COVID-19.  Should he contract the virus while waiting for an administrative response, any remedy will come too late.  Benenfeld will be in mortal danger, causing him potentially irreparable physical harm and rendering this compassionate release request utterly moot.  *See Sorbello v. Laird*, No. 06 CV 948 (JG), 2007 WL 675798, at *3 n.8 (E.D.N.Y. Feb. 28, 2007) (refusing to dismiss petition requesting designation to halfway house "for failure to exhaust administrative remedies" where delay in processing administrative

remedies would "result in the irreparable harm of late designation to community confinement"); *see also Pimentel v. Gonzales*, 367 F. Supp. 2d 365, 371 (E.D.N.Y. 2005) (addressing merits of request for designation to halfway house, where "not only would an administrative appeal be futile, but without immediate relief by this court, Pimentel could suffer irreparable harm").[16] Like the defendant in *United States v. Wilson Perez*, even "**a few weeks' delay carries the risk of catastrophic health consequences**" for Benenfeld. *United States v. Wilson Perez*, No. 17-CR-513-3 (AT), 2020 WL 1546422, *supra*, at *3 (emphasis added).

The Bureau of Prisons has known for months of the impending COVID-19 crisis, creating a further reason to excuse Benenfeld's failure to exhaust all administrative remedies. The BOP has had ample opportunity to adequately prepare Devens for this emerging health crisis, which would have obviated the need for Benenfeld's emergency compassionate release petition.  Because the BOP was on notice of the potential dangers to inmates with underlying health issues like him, Benenfeld should not be required to wait while the BOP takes additional time addressing his administrative request.  See *United States* v. *Basciano*, *supra*, 369 F. Supp. 2d at 349 (despite failure to exhaust administrative remedies, because "the BOP ha[d] not addressed [his] request for relief in a timely fashion," despite "ample opportunity" to do so, the court found that "[t]he administrative appeals process would thus, in the circumstances of this case, be an empty formality that would risk exposing Basciano to irreparable harm").  Benenfeld should not be forced to bear the brunt of the facility's failure to adequately prepare for COVID-

---

[16] The factual questions at issue regarding the rapid spread of COVID-19, the serious danger to certain high risk individuals and Benenfeld's health conditions placing him squarely in the highest fatal risk group, are well-developed in the record before this Court, thus rendering administrative exhaustion all but pointless. *See Gurzi, supra*, No. 18-CV-3104-NEB-KMM, 2019 WL 6481212, at *2 ("given the clear circumstances here, a principal purpose of administrative exhaustion, the development and crystallization of the factual record, is not implicated in this case") (internal quotation marks and citations omitted).

19.  In these extraordinary circumstances, the Court should waive the administrative exhaustion requirement in Section 3582.

**C.  <u>Benenfeld Should Be Deemed To Have Exhausted His Remedies</u>**

In light of the unprecedented COVID-19 outbreak and pandemic – an unparalleled spread of a new disease that the compassionate release statute did not anticipate – and the severe health consequences COVID-19 can cause to people like Moshe Benenfeld, courts across the country have waived the exhaustion of remedies requirement under various circumstances in deciding motions for compassionate release relating to COVID-19.  For instance, courts have waived the requirement when there was no one to process the request at the BOP.  *See United States v. Teresa Ann Gonzalez*, 2:18-CR-0232-TOR-15, 2020 WL 1536155, at *1 (E.D. Wash. Mar. 31, 2020) (BOP could not process request because inmate was not in BOP custody); *see also United States v. Eli Dana*, 1:14-cr-00405-JMF (S.D.N.Y.) (Furman, J) (docket entry 108, the Court did not address exhaustion but as part of the motion, docket entry 105, petitioner argued that seeking administrative remedies was futile because he was not held by the BOP but was rather an inmate at a contract facility).  In addition, receiving a simple email denying a request was deemed sufficient rather than requiring further administrative appeals, as would usually be required.  *United States v. Campagna*, 16-CR-78-01 (LGS), 2020 WL 1489829, at *1 (S.D.N.Y. Mar. 27, 2020) (finding that the defendant had exhausted his administrative remedies after emailing the Resident Reentry Manager seeking a compassionate release and receiving an email denying such relief).  Further, even if the BOP does not consent to the request, if the prosecutor consents, exhaustion of administrative remedies is deemed waived.  *See USA v. Webb*, 15-CR-00252-PKC-RML-8 (E.D.N.Y.) (Chen, J) (docket entry dated 3/30/2020).[17]

---

[17]     Note, cases where exhaustion was not deemed waived are distinguishable because those cases did not present compelling information on the petitioners' medical condition that deemed them at risk.  *United States v.*

In this case, both Benenfeld and his attorneys have desperately sought an immediate response from the warden of Devens, and reached out to the Government regarding his compassionate release request, in light of the COVID-19 pandemic, but no determination has been forthcoming and counsel has been told that there is no time-frame for a decision.  This is similar to the BOP not being able to process a request in a timely manner, which deemed the exhaustion requirement waived in *United States v. Teresa Ann Gonzalez*.  *See United States v. Teresa Ann Gonzalez*, *supra*, 2:18-CR-0232-TOR-15, 2020 WL 1536155, at *1.  Nevertheless, it is clear that courts have been flexible in deeming the administrative process waived with respect to inmates seeking compassionate relief because of COVID-19.[18]  In this case, the requirement should be waived, as Benenfeld has made extraordinary efforts to have an immediate determination of this issue and the possible deadly health consequences to Benenfeld if none is forthcoming.

---

*Wilson Perez*, *supra*, No. 17-CR-513-3 (AT), 2020 WL 1546422, at *3 (distinguishing cases where exhaustion was not deemed waived and noting "in none of them did the defendant present compelling evidence that his medical condition put him at particular risk of experiencing deadly complications from COVID-19").  In this case, there is overwhelming evidence of the risk to Benenfeld.  In addition, in this case, there is clear evidence that COVID-19 is spreading in Devens because many prisoners have been isolated due to exposure to COVID-19.  *See id.* (distinguishing cases where exhaustion was not deemed waived and noting "in several of those cases, the defendant was not in a facility where COVID-19 was spreading").

[18]     Also of note is *Chun v. Edge*, 20-CV-1590 (RPK) (E.D.N.Y.) where on April 2, 2020, the court directed "the parties to make themselves available today for discussions with Magistrate Judge Mann, in order to explore whether the parties can reach an agreement on any of the matters at issue in petitioners' application for a temporary restraining order.  The Court specifically requests that the parties consider whether an agreement is possible to enable petitioners to promptly obtain adjudication of claims for release under the compassionate-release provision at 18 U.S.C § 3582(c)(1)(A), or any other mechanism that countenances early release of prisoners."  The order wanted the conference to explore whether "prompt review under Section 3582(c)(1)(A) could be obtained through, for example, an agreement on the part of the BOP to adjudicate petitioners' compassionate-release requests in an expedited fashion."  In addition, in *United States v. Murgio*, 1:15-cr-00769 (S.D.N.Y.), after an inmate noted issues with applying to the BOP and receiving a response for compassionate release, the Court allowed for the government to respond but directed the government to specifically respond to the questions: "Does Defendant currently have the ability to make administrative requests? . . . If so, how may he do so under current conditions? . . . How long will it take for him to receive a response?" (ECF 754, April 2, 2020).  Thus, though Benenfeld believes that exhaustion is waived, even if the Court disagrees and finds that it has not been, it is requested that this Court follow what other courts in E.D.N.Y. and S.D.N.Y. have done to ensure a prompt response from the BOP.

### D.  The Factual Record Is Properly Developed
### <u>Which Allows The Court To Rule On This Application</u>

The purpose of the exhaustion requirement under Section 3582(c)(1)(A) is to provide the BOP a chance to do a detailed factual review of the circumstances of each prisoner's request, to determine whether it finds there are extraordinary and compelling circumstances to justify a reduction in the defendant's sentence.[19]  Plainly speaking, such a detailed dive into the request is inappropriate at this unprecedented time of national life and death emergency, especially for Moshe Benenfeld.  In addition, the factual record regarding the dangers of COVID-19 and Benenfeld's health are well developed.  Namely, it is a matter of public record how dangerous COVID-19 is to the world, let alone to people with health conditions like Benenfeld.  His health and medical conditions have been developed previously in this case and additional evidence specific to COVID-19 is being presented in this Motion.  Therefore, the factual record is adequate for the Court to make a determination on this Motion.

### <u>POINT III</u>

### THE COVID-19 OUTBREAK PRESENTS A COMPELLING AND EXTRAORDINARY CIRCUMSTANCE THAT WARRANTS COMPASSIONATE <u>RELEASE FOR BENENFELD, WHO IS A HIGH-RISK FATALITY PATIENT</u>

On March 11, 2020, the World Health Organization ("WHO") officially classified the new strain of coronavirus, COVID-19, as a pandemic.[20]  As of April 3, 2020 COVID-19 has infected over one million people worldwide, leading to at least 54,000 deaths.[21]  In the United

---

[19]      *See United States Department of Justice Federal Bureau of Prisons Program Statement 5050.50, Compassionate Release/Reduction in Sentence: Procedures for Implementation of 18 U.S.C. §§ 3582 and 4205(g)*, ¶ 7, available at https://www.bop.gov/policy/progstat/5050_050_EN.pdf.

[20]      *See WHO Characterizes COVID-19 as a Pandemic*, World Health Organization (March 11, 2020), available at https://www.who.int/dg/speeches/detail/who-director-general-s-opening-remarks-at-the-media-briefing-on-covid-19---11-march-2020.

[21]      *See Coronavirus Map: Tracking the Global Outbreak*, New York Times, available at https://www.nytimes.com/interactive/2020/world/coronavirus-maps.html (updated regularly).

States, approximately 258,611 people have been infected, leading to 6,660 deaths nationwide.[22]
These numbers almost certainly underrepresent the true scope of the crisis; test kits in the United
States have been inadequate to meet demand.

### A.  COVID-19 Response And Cases In Massachusetts

On March 10, 2020 the governor of Massachusetts (where Devens is located), Governor
Charlie Baker, declared a state of emergency in Massachusetts.[23]  A few days later, on March 13,
2020, the White House declared a national emergency, under Section 319 of the Public Health
Service Act, 42 U.S.C. § 247(d).[24]  On March 16, 2020, the White House issued guidance to all
citizens recommending that, for the next eight weeks, gatherings of ten or more people be
canceled or postponed.[25]  The entire state of Massachusetts is under a "Stay-At-Home
Advisory," which was issued on March 24, 2020 and remains in effect.[26]  These drastic measures
came following the issuance of a report by British epidemiologists, concluding from emerging
data that 2.2 million Americans could die without drastic intervention to slow the global spread
of the deadly disease.[27]

As of April 2, 2020, there have been approximately 8,966 confirmed cases of COVID-19
in the State of Massachusetts overall, with 1,870 cases in Middlesex County and at least 154

---

[22]     *See id.*

[23]     *See COVID-19 State of Emergency*, available at https://www.mass.gov/info-details/covid-19-state-of-emergency (updated regularly).

[24]     *See The White House, Proclamation on Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak* (March 13, 2020), available at https://www.whitehouse.gov/presidential-actions/proclemation-declaring-national-emergencyconcerning-novel-coronavirus-disease-covid-19-outbreak/.

[25]     *See* Sheri Fink, *White House Takes New Line After Dire Report on Death Toll*, New York Times (March 17, 2020), available at https://www.nytimes.com/2020/03/17/us/coronavirus-fatality-ratewhitehouse.html?action=click&module=Spotlight&pgtype=Homepage.

[26]     *See COVID-19 State of Emergency*, available at https://www.mass.gov/info-details/covid-19-state-of-emergency (updated regularly).

[27]     *See* Fink, *White House Takes New Line After Dire Report on Death Toll*, New York Times, *supra*.

deaths.[28]  Additionally, COVID-19 has already been introduced into the Massachusetts Department of Correction facilities.  As of April 2, 2020, within the Massachusetts state facilities, there have been a total number of 34 positive cases.[29]  ***Already one inmate, who like Benenfeld, "was in his 50s with underlying health conditions" has died due to COVID-19***.[30]

Therefore, lawyers from the Committee for Public Counsel Services, the Massachusetts Association of Criminal Defense Lawyers and the American Civil Liberties Union have petitioned on the Massachusetts Supreme Judicial Court to release certain state prisoners, as "[c]orrectional facilities, where physical distancing and vigilant hygiene are impossible, can be petri dishes for the rapid spread of infectious disease."[31]  "The petition seeks to lower the number of prisoners through, among other measures, the ***release of incarcerated individuals who are vulnerable to COVID-19***, near the end of their sentence, or ***who do not pose a threat to the public***."[32]  Oral argument was heard on March 31, 2020, and the court has not yet issued a decision.[33]

### B.  Guidance From The Centers For Diseases Control And Prevention Requires Granting Moshe Benenfeld's Request For Compassionate Release

The Centers for Disease Control and Prevention ("CDC") has also issued guidance related to the deadly effects of COVID-19 on certain high-risk patients of the population.  The CDC has identified the population most at risk of severe illness or death from the disease to

---

[28]     *See COVID-19 cases in Massachusetts*, available at https://www.mass.gov/info-details/covid-19-cases-quarantine-and-monitoring (updated daily).
[29]     *See* Jennifer B, McKim, *First Massachusetts Inmate Dies From COVID-19*, WGBH News (April 2, 2020), available at https://www.wgbh.org/news/local-news/2020/04/02/coronavirus-infections-continue-to-rise-in-massachusetts-prisons
[30]     *See id.*
[31]     *See* John Maroney, Nathalie Sczublewski and Caroline Connoly, NB10 Boston, *Mass. Court Weighs Request to Release Prisoners in Face of Coronavirus Pandemic* (March 31, 2020), available at https://www.nbcboston.com/news/local/decision-to-be-made-on-whether-to-release-inmates/2099887/.
[32]     *See id.* (internal quotation marks omitted) (emphasis added).
[33]     *See id.*

include "older adults and people of any age who have serious underlying medical conditions," as well as those "who live in a nursing home or long-term care facility." [34]  Those with chronic medical conditions, such as lung disease, heart disease, and diabetes, as well as those who are immune-compromised, are also at a higher risk.[35]  For these individuals, the CDC warned to take immediate preventative actions, including avoiding crowded areas and staying at home as much as possible.[36]

Moshe Benenfeld falls into all the categories described by the CDC as having a "higher risk for severe illness" if he were to contract COVID-19.  He is severely immuno-compromised and has a multitude of other "serious underlying medical conditions," as outlined above.  He is also an "older adult" who is being held in a "long-term care facility."  For these reasons, there is a very real possibility that if Benenfeld were to contract COVID-19 while being held at Devens, which is more than likely, the outcome will not be a good one.

### C. The Attorney General Memorandum And Case Law Require Granting Moshe Benenfeld's Request For Compassionate Release

Further, on March 26, 2020, Attorney General William P. Barr issued guidelines to the Bureau of Prisons, encouraging the release of eligible inmates.  The Office of the Attorney General distributed a Memorandum to the Director of the Bureau of Prisons, with the subject "Prioritization of Home Confinement As Appropriate in Response to COVID-19 Pandemic" ("Attorney General Memorandum").  *See* Exhibit G to the Twersky Decl., Attorney General Memorandum.  ***The Attorney General Memorandum is specifically instructive here and greatly***

---

[34]     *See People At Risk for Serious Illness from COVID-19*, CDC (March 31, 200), available at https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher risk.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fspecific-groups%2Fhigh-risk-complications.html .

[35]     *See id.*

[36]     *See id.*

*favors allowing Benenfeld to finish his sentence in home confinement, in light of the COVID-*

*19 pandemic*.

The Attorney General Memorandum specifically states:

there are some *at-risk inmates who are non-violent and pose minimal likelihood of recidivism and who might be safer serving their sentences in home confinement rather than in BOP facilities*.  I am issuing this Memorandum to ensure that we utilize home confinement, where appropriate, to protect the health and safety of BOP personnel and the people in our custody.

*See* Exhibit G, Attorney General Memorandum, p. 1 (emphasis added).

Under the heading, "Transfer of Inmate to Home Confinement Where Appropriate to

Decrease the Risks to Their Health," the Attorney General Memorandum goes on to state:

One of BOP's tools to manage the prison population and *keep inmates safe is the ability to grant certain eligible prisoners home confinement in certain circumstances*.  I am hereby *directing you to prioritize the use of your various statutory authorities to grant home confinement for inmates seeking transfer in connection with the ongoing COVID-1 9 pandemic* . . . for some eligible inmates, home confinement might be more effective in protecting their health.

*See* Exhibit G, Attorney General Memorandum, p. 1 (emphasis added).

When asked about the Attorney General Memorandum, BOP spokesman Justin Long

said, "We will be working to ensure we utilize home confinement, consistent with the memo, to

protect the health and safety of BOP staff and inmates in our custody."[37]

Moshe Benenfeld is the exact type of inmate whom the Attorney General is seeking to

protect, in directing the BOP to "*grant certain eligible prisoners home confinement . . . in*

*connection with the ongoing COVID-1 9 pandemic*."  *Id*.  His major health problems put him

"at-risk" if he contracts COVID-19, he is "non-violent" and poses zero "likelihood of

---

[37]     *See* Shayna Jacobs, *N.Y. halfway house hit by coronavirus balked at judge's order to release at-risk inmate, his lawyers say*, The Washington Post (April 1, 2020), a https://www.washingtonpost.com/world/national-security/coronavirus-brooklyn-halfway-house-bureau-of-prisons/2020/04/01/45a38912-737b-11ea-87da-77a8136c1a6d_story.html.

recidivism." *Id*.

The Attorney General Memorandum lists factors in which the BOP should use in "assessing which inmates should be granted home confinement pursuant to this Memorandum." *Id*. The BOP is instructed to "to consider the totality of circumstances for each individual inmate, the statutory requirements for home confinement," and a "non-exhaustive list of discretionary factors" which include:

> • The *age and vulnerability of the inmate to COVID-19*, in accordance with the Centers for Disease Control and Prevention (CDC) guidelines;
>
> • The security level of the facility currently holding the inmate, with *priority given to inmates residing in low and minimum security facilities*;
>
> • The *inmate's conduct in prison*, with inmates who have engaged in violent or gang related activity in prison or who have incurred a BOP violation within the last year not receiving priority treatment under this Memorandum;
> • Whether the inmate has a demonstrated and *verifiable re-entry plan* that will prevent recidivism and maximize public safety, including verification that the conditions under which the inmate would be confined upon release would present a lower risk of contracting COVID-19 than the inmate would face in his or her BOP facility;
>
> • The inmate's *crime of conviction, and assessment of the danger posed by the inmate to the community*. Some offenses, such as sex offenses, will render an inmate ineligible for home detention. Other serious offenses should weigh more heavily against consideration for home detention.

*See* Exhibit G, Attorney General Memorandum, p. 1-2 (emphasis added).

All of these factors weigh heavily in favor of allowing Moshe Benenfeld to serve out his sentence under home confinement. His age and extensive medical history and diagnoses make him extremely vulnerable to COVID-19. While Devens is an administrative security medical center, Moshe Benenfeld is certainly a minimum security prisoner. Benenfeld's conduct while incarcerated has been perfect and he has not been in any trouble. His re-entry plan would consist of going straight to an address approved by the Department of Probation, to be confined under

23

G.P.S. monitor, where he would stay alone with a home health-aid.  Lastly, Benenfeld's crime of conviction was a non-violent banking crime, which does not weigh against home confinement or detention.  It is clear that following the Attorney General's directive and recommendation, Moshe Benenfeld's Motion must be granted and he should be ordered to serve the remainder of his sentence on home confinement.

In addition, recent case law supports the fact that an increased risk of severe illness or death due to the COVID-19 outbreak, constitutes extraordinary and compelling reasons under Section 3582(c)(1)(A) and U.S.S.G. § 1B1.13.  *USA v. Colvin*, No. 3:19CR179 (JBA), 2020 WL 1613943, at *4 (D. Conn. Apr. 2, 2020)(noting the defendant met the extraordinary and compelling reason requirement due the fact that she had a "serious ... medical condition," which substantially increases her risk of severe illness if she contracts COVID-19).  In addition, Courts have recognized the "expectation that the COVID-19 pandemic will continue to grow and spread over the next several weeks" necessitating home release.  *USA v. Colvin*, No. 3:19CR179 (JBA), 2020 WL 1613943, at *4 (D. Conn. Apr. 2, 2020); *United States v. Wilson Perez*, No. 17-CR-513-3 (AT), 2020 WL 1546422, at *2 (S.D.N.Y. Apr. 1, 2020) (noting factors that point towards extraordinary and compelling reasons to justify compassionate release including the vulnerability of the defendant and that prison is particularly dangerous place with regards to COVID-19); *see also USA v. Rodriguez*, No. 2:03-CR-00271-AB-1, 2020 WL 1627331, at *7 (E.D. Pa. Apr. 1, 2020) (same).

<u>POINT IV</u>

**THE CONDITIONS OF BOP INCARCERATION FOSTER THE SPREAD
OF COVID-19, AND BENENFELD'S AGE AND PREEXISTING MEDICAL
CONDITIONS RENDER HIM PARTICULARLY SUSCEPTIBLE TO AN
UNREASONABLE RISK OF DEATH AND AN INABILITY TO TAKE
<u>PREVENTATIVE MEASURES OR SELF-CARE RECOMMENDED BY THE CDC</u>**

If it is not there already, it is only a matter of time before COVID-19 finds its way into

Devens, where Moshe Benenfeld is housed.  Indeed, the disease already has spread quickly

throughout Massachusetts, Middlesex County and other jails and prisons in Massachusetts.

Conditions of confinement at Devens, like other prisons, create an optimal environment for the

transmission of contagious disease.[38]  People who work in the facility leave and return daily and

there are regular deliveries of supplies made to Devens, coming from all over.  Up until the BOP

suspended visits to all of its facilities on March 13, 2020, inmates were having social, legal and

medical visits regularly, even after the initial spread of the virus.[39]  Public health experts are

unanimous in their opinion that incarcerated individuals "are at special risk of infection, given

their living situations," and "may also be less able to participate in proactive measures to keep

themselves safe," and "infection control is challenging in these settings."[40] This rings even more

true for inmates like Moshe Benenfeld, who have underlying health issues, which make them

even more susceptible to COVID-19.

---

[38]    *See* Joseph A. Bick, *Infection Control in Jails and Prisons*, Clinical Infectious Diseases 45(8):
1047-1055 (2007), available at https://academic.oup.com/cid/article/45/8/1047/344842; *see also Prisons and Jails
are Vulnerable to COVID-19 Outbreaks*, The Verge (Mar. 7, 2020), available at
https://www.theverge.com/2020/3/7/21167807/coronavirus-prison-jail-health-outbreak-covid-19-flu-soap; *see also
An Epicenter of the Pandemic Will Be Jails and Prisons, If Inaction Continues*, The New York Times (March 16,
2020), available at https://www.nytimes.com/2020/03/16/opinion/coronavirus-in-jails.html.
[39]    *See Federal Bureau of Prisons Covid-19 Action Plan*, available at
https://www.bop.gov/resources/news/20200313_covid-19.jsp.
[40]    *See Achieving a Fair and Effective COVID-19 Response: An Open Letter to Vice-President Mike
Pence, and Other Federal, State, and Local Leaders from Public Health and Legal Experts in the
United States* (March 2, 2020), available at
https://law.yale.edu/sites/default/files/area/center/ghjp/documents/final_covid-19_letter_from_public_health_and_
legal_experts.pdf.

**A.** __The Conditions At Devens Prevent Benenfeld From Protecting Himself__

Moshe Benenfeld is powerless to take the preventative self-care measures directed by the CDC for his high-risk group to remain safe from COVID-19 infection.  He cannot self-quarantine or partake in "social distancing" in his prison facility.  Benenfeld shares a room with three others, living in close proximity to each other.  All four share one bathroom.  Until recently, the community spaces where inmates and prison staff gather were still open; however the outbreak has shuttered the library, barber shop and other common areas have been closed. Benenfeld is now forced to spend all his time confined to his room in close proximity to three others – and there is no telling if anyone of them have the virus or have been exposed to COVID-19 in some manner.  The inmates are not allowed to leave their unit unless an officer escorts them off, forcing many people to crowd into smaller spaces.  Medical visits to the clinic, which Benenfeld used to have several times per week, are now suspended and a nurse occasionally comes to him to change his ostomy bag at his bedside, which is completely unhygienic.

This all may be too little, too late, as Benenfeld has relayed to counsel that there are already many inmates who have been put in isolation, because of exposure to COVID-19 while at medical appointments at the hospital.  It is clear that COVDI-19 has already entered Devens and Moshe Benenfeld is powerless to protect himself properly.

High-density places such as prisons are precisely the kind of spaces that have caused the alarmingly high-spread rates of COVID-19.  Hand sanitizer, an effective disinfectant recommended by the CDC to reduce transmission rates, is already in low supply at Devens. Correctional health experts worry that no matter what precautions are taken by crowded prisons,

these facilities may become incubators for the COVID-19 disease.[41]  It was only on March 30, 2020 that staff at Devens began wearing masks and gloves while on duty.

During the H1N1 epidemic in 2009, many jails and prisons dealt with high numbers of cases because they could not maintain the level of separation and sanitation necessary to prevent widespread infection.[42]  During this current COVID-19 pandemic, the Prison Policy Initiative has called on American jails and prisons to release medically fragile and older adults, noting that these persons are at high risk for serious complications and even death from COVID-19.[43]

Similarly, members of Congress have written to the Department of Justice and BOP, to urge that efforts be made to allow immediate release of non-violent, elderly inmates.[44] Representatives Nadler and Bass state, "DOJ and BOP must also do all they can to *release as many people as possible who are currently behind bars and at risk of getting sick*.  Pursuant to 18 U.S.C. 3582(c)(1)(A), the Director of the Bureau of Prisons may move the court to reduce an inmate's term of imprisonment for extraordinary and compelling reasons.[45]

Given that Moshe Benenfeld is 51 years old and suffers from significant underlying health issues that make him exceptionally vulnerable to COVID-19, numerous compelling and extraordinary circumstances exist to support compassionate release at this unique time in our country's history.  There is an urgent need to act now, before the virus spreads within Devens and Benenfeld becomes infected.  As described in the attached declaration of Dr. Jamie Meyer,

---

[41]     *See* Michael Kaste, *Prisons and Jails Worry About Becoming Coronavirus 'Incubators,'"* NPR (March 13, 2020), available at https://www.npr.org/2020/03/13/815002735/prisons-and-jailsworry-about-becoming-coronavirus-incubators.
[42]     *See Prisons and Jails are Vulnerable to COVID-19 Outbreaks*, The Verge (Mar. 7, 2020), available at https://www.theverge.com/2020/3/7/21167807/coronavirus-prison-jail-health-outbreak-covid-19-flu-soap.
[43]     *See* Peter Wagner & Emily Widra, *No Need to Wait For Pandemics: The Public Health Case for Criminal Justice Reform*, Prison Policy Initiative (March 6, 2020), available at https://www.prisonpolicy.org/blog/2020/03/06/pandemic.
[44]     *See Letter of Representatives Jerrold Nadler and Karen Bass* (March 19, 2020), available at https://judiciary.house.gov/uploadedfiles/2020-03-19_letter_to_ag_barr_re_covid19.pdf.
[45]     *See id*. (emphasis added) (internal quotation marks omitted).

an infectious disease specialist and Assistant Professor of Medicine at Yale School of Medicine, inmates are uniquely vulnerable: "[t]he risk posed by infectious diseases in jails and prisons is significantly higher than in the community, both in terms of risk of transmission, exposure, and harm to individuals who become infected." *See* Exhibit H to the Twerksy Decl., Declaration of Dr. Jamie Meyer, dated March 15, 2020.  Dr. Meyer describes the inadequate pandemic preparedness plans in many detention facilities and the difficulty of separating infected or symptomatic inmates from others. *See id*.  Moshe Benenfeld's own doctor is seriously concerned about how he would fare if he were to contract COVID-19 and "***places him at a high risk for complications, including death, if he were to develop covid-19 infection***."  *See* Exhibit F, Letter from Dr. Paul T. Smith, dated April 1, 2020.  In summary, the COVID-19 virus is highly transmissible, extraordinarily dangerous and poses a severe threat of death to the high-risk medical profile of Moshe Benenfeld.  The conditions at Devens do not allow Benenfeld to take the self-care measures required by the CDC to protect his safety and therefore the Court must step in and modify his sentence to home incarceration, so that his life is not put in danger.

### POINT V

### THE RELEVANT § 3553(a) FACTORS, INCLUDING <br> BENENFELD'S RELEASE PLAN, FAVOR RESENTENCING

Once extraordinary and compelling reasons are established, the Court must consider the relevant sentencing factors in §3553(a) to determine whether a sentencing reduction is warranted. *See* 18 U.S.C. § 3582(c)(1)(A)(i).  The relevant factors listed in 18 U.S.C. § 3553(a) include:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
> (2) the need for the sentence imposed—
> > (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

> (B) to afford adequate deterrence to criminal conduct;
> (C) to protect the public from further crimes of the defendant . . .

*See* 18 U.S.C. § 3553(a).

Here, a review of the Section 3553(a) factors, along with Benenfeld's release plan of home confinement and incarceration under electronic G.P.S. monitoring for the remainder of his unserved original term of imprisonment, favor granting Benenfeld's compassionate release.

Firstly, the charged offense was Benenfeld's first and only brush with the law. His non-violent crime was committed based upon his position with a banking institution. As part of his settlement with the FDIC, he has agreed to an Order of Prohibition, not to seek or accept employment by any FDIC-insured banking, financial, or monetary institution, which will act as a strong deterrence. Next, his 63 month sentence, followed by 5 years of probation certainly reflects the seriousness of the offense, even if served under terms of restrictive home confinement (further detailed below), and affords adequate deterrence to Benenfeld.

Lastly, Benenfeld does not pose a credible threat to the safety of the public and he is certainly not a danger to the community. He was not held in confinement pending trial of his criminal case and has zero chance of recidivism. This, coupled with his physical impairments and medical infirmities, ensures that the public does not have to be protected from him. Moshe Benenfeld simply wishes to finish his sentence – under continued home confinement and incarceration, with strict conditions, without the elevated threat of COVID-19 hanging over his head. He is wheelchair bound and will be for the rest of his life. He poses no harm to others and can continue to be confined safely there until the end of his term of imprisonment in 2024. All of these Section 3553(a) factors weigh in favor of modifying Moshe Benenfeld's sentence to home confinement and incarceration, in light of the COVID-19 pandemic.

Indeed, any Section 3553(a) factor which may the Court may view as disfavoring to

resentencing or modifying Benenfeld's sentence, is largely overcome by the unreasonable threat

of death in Benenfeld's current conditions of confinement, should he contract COVID-19.  Since

there are conditions of home detention which can still provide a "sufficient but not greater than

necessary" sanction of punishment, the Court can comfortably resentence Benenfeld to home

confinement.  *See* 18 U.S.C. § 3553(a).  Benenfeld has been serving his sentence at Devens as a

sick and immune-compromised man, with many diagnoses and medication taken daily.  He deals

with much more than an average prisoner, on a daily basis.  As the court noted in *McGraw*, *infra*,

"his sentence has been significantly more laborious than that served by most inmates."  *United*

*States v. McGraw*, No-02-Cr.-18, 2019 WL 2059488, at *5 (S.D. Ind. May 9, 2019).

    While conceding that Benenfeld only recently began serving his sentence and that he still

has over four years unserved from his original sentence, the circumstances since his sentencing

have certainly changed.  The Government cannot dispute the serious physical danger created by

the current pandemic to someone with Moshe Benenfeld's medical profile.  It also cannot

guarantee or provide any sense of confidence that this widespread virus will not make its way

inside the doors of the federal facility at Devens.  ***If and when the virus spreads inside the***

***prison, and this is not alarmist hyperbole, it likely will kill Moshe Benenfeld***.  This Court never

intended to impose such a risk at the time of Benenfeld's original sentencing.

    We propose that as part of Benenfeld's continued punishment in this case, that the Court

convert the remaining years of his expected term of imprisonment, through July 2024, to strict

home detention as a condition of supervised release.  In this way, Benenfeld will continue to face

confinement as a measure of due punishment, but without the serious risk to his physical health

looming over him.  The recently amended compassionate release statute, at 18 U.S.C. § 3582

(c)(1)(A), authorizes the Court to extend supervised release in this way.  *See* 18 U.S.C. §

3582(c)(1)(A) (the court "may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment"). Such a prolonged period of home incarceration definitely meets Section 3553(a)'s purpose to give due respect for the law and to acknowledge the seriousness of the offense.

Congress's expansion of the compassionate release statute by Section 603(b) of the First Step Act reflects congressional intent for courts to have greater flexibility in reducing sentences when compelling circumstances justify a later review.  The title of the amendment, "Increasing the Use and Transparency of Compassionate Release," accentuates that intent.  The evolving case law also demonstrates that courts have construed their discretion generously to effectuate Congressional desire to increase the use of the compassionate release statute encouraged by this amendment.

Significantly, courts weighing Section 3553(a) factors have granted release to defendants with convictions for serious crimes and with histories of violence*, neither of which are present here*, finding that changed health circumstances, aging defendants, post-offense rehabilitation and carefully crafted conditions of supervised release ameliorate public safety concerns.  In *United States v. Bailey*, for example, the defendant was sentenced to 30 years for "an extensive racketeering scheme," including a specific finding that the defendant committed offenses relating to a murder.  *United States v. Bailey*, No. 94-cr-481 (N.D. Ill. July 24, 2019) (slip op. at 1).  The parties agreed that the defendant, who was almost 90 years old and suffered from multiple health issues, had satisfied the statutory requirements for compassionate release.  *See id*.  However, the government opposed release under the Section 3553(a) factors due to the "reprehensible nature of the offense."  *See id*.

The court acknowledged that the defendant's criminal history and serious offense

conduct supported a denial of the requested reduced sentence.  *See id*.  But the court weighed the more recent factors in the defendant's favor, including his institutional adjustment, lack of disciplinary infractions, his advanced age, and his release plan, and concluded that they "point in the opposite direction."  *See id*.  In weighing these more recent favorable factors over the defendant's past criminal history, the court granted the reduced sentencing request, concluding that release at this stage of the defendant's life would not minimize the severity of the offense and the defendant no longer posed any credible threat to the public. *See id*. at 2.

In a District of Oregon case, the court likewise granted compassionate release to a defendant, who was also serving a 30-year sentence for leading a "major drug conspiracy." *United States v. Spears*, No. 3:98-Cr.-208-SI-22, 2019 WL 5190877, at *4 (D. Or. Oct. 15, 2019).  As explained in the court's opinion granting release there, the defendant's history included crimes of violence, his performance on supervised release had been poor and he committed the last serious offense for which he was serving imprisonment when he was in his fifties.  *See id*.  Despite these findings, the district court found that the defendant was now 76 years old and suffered from "multiple chronic serious medical conditions and limited life expectancy."  *Id*. at *1.  Although the government persisted that the defendant remained dangerous, the court disagreed.  The court concluded that, in light of the defendant's strong family support, the age of his prior convictions and his diminished physical condition, "appropriate supervision conditions can mitigate any limited risk" to public safety and provide sufficient specific deterrence.  *Id*. at *5.

Similarly, in *United States v. McGraw*, the court granted compassionate release from the defendant's life sentence for a drug trafficking conspiracy based on the defendant's serious health concerns and diminished ability to provide self-care under commentary note 1(A)(ii) of

USSG § 1B1.13.  *See United States v. McGraw*, No-02-Cr.-18, 2019 WL 2059488 (S.D. Ind.

May 9, 2019).  The defendant, who was approximately 55 years old at the time of the offense,

was 72 years old at the time of the court's release opinion and suffered from limited mobility,

diabetes, and chronic kidney disease.  *See id*. at *2.  The government argued that the defendant

remained a danger to the community because of his leadership in a notorious motorcycle gang,

noting that he could continue his criminal activity with simple access to a telephone.  *See id*. at

*4.  The court, however, concluded that given the defendant's frail health, his positive record at

the institution, and the ability of the court to impose conditions that would reasonable assure the

safety of the community upon release, the more flexible compassionate release statute, as

amended by the First Step Act, favored granting the defendant's motion.  *See id*.  With respect to

the Section 3553(a) factors, the court concluded that the "significant sanction" the defendant had

already served was sufficient:

> But further incarceration is not needed to deter Mr. McGraw from further
> offenses; nor for reasons described above, is it necessary to protect the public
> from future crimes.  ***Finally, Mr. McGraw has served much of his sentence
> while seriously ill and in physical discomfort. This means that his sentence has
> been significantly more laborious than that served by most inmates***.  It also
> means that further incarceration in his condition would be greater than necessary
> to serve the purposes of punishment set forth in § 3553(a)(2).

*Id*. at *5 (emphasis added).

The court imposed lifetime supervision to "continue to serve as a sanction and general deterrent,

appropriately recognizing the seriousness of Mr. McGraw's conduct."  *Id*. at *4.

As amplified in the cited cases above, the release of Moshe Benenfeld, an aged and

infirm man, extremely susceptible to severe illness if infected by COVID-19, under the current

extraordinary and compelling circumstances of the threat of a novel contagion contaminating the

prison, would not serve to diminish the seriousness of the offense of conviction, but would

instead fulfill Congress's intent in offering courts greater flexibility to reduce sentences when changed circumstances justify a later review.  Benenfeld's pre-existing health conditions, his age and the rapidly advancing COVID-19 outbreak, together with the prison's inflexibility to give Benenfeld the ability to take self-care measures directed by the CDC to remain safe during the outbreak, warrant a reduced and modified sentence in his case.

## CONCLUSION

WHEREFORE, for the foregoing reasons, I respectfully request that the Court: a) grant Defendant Moshe Benenfeld's Motion for Compassionate Release, pursuant to 18 U.S.C.A. § 3582 (C)(1)(A)(i), in its entirety; b) issue an Order reducing and modifying Benenfeld's sentence to time served with an extended period of supervised release of 4 years and 3 months (to cover the unserved portion of his prison term), with a condition of home incarceration and confinement and G.P.S monitoring; and c) grant such other and further relief as the Court deems just and proper.

Dated: New York, New York
      April 3, 2020

**TWERSKY PLLC**

By: _____

Aaron Twersky, Esq.
Jason Lowe, Esq.
Ilana Neufeld, Esq.
747 Third Avenue, 32nd Floor
New York, New York 10017
(212) 425-0149
atwersky@twerskylaw.com (email)
jlowe@twerskylaw.com (email)
ineufeld@twerskylaw.com (email)

*Attorneys for Defendant*
*Moshe Benenfeld*

34

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------------x

UNITED STATES OF AMERICA,                           Case No: 18-CR-485 (LAP)

               -against-

MOSHE BENENFELD,

                   Defendant.

-------------------------------------------------------------------------x

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT MOSHE BENENFELD'S**
**<u>MOTION FOR COMPASSIONATE RELEASE UNDER 18 U.S.C. § 3582(c)(1)(A)</u>**

**TWERSKY PLLC**
747 Third Avenue, 32nd Floor
New York, New York 10017
(212) 425-0149

*Attorneys for Defendant Moshe Benenfeld*